## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANA GRULLON,** | : | **Civil No.  3:23-CV-745** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security[1]** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Administrative Law Judge's (ALJ's) decision denying this application for disability benefits rests upon a proposition which is completely divorced from practical economic realities. The plaintiff, Ana Grullon, was born in the Dominican Republic and received a rudimentary education in Spanish in that country. (Tr. 290). Her native language is Spanish and she neither reads, nor writes, nor speaks English to any appreciable degree.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

Despite her complete lack of any English proficiency, the ALJ found that Grullon was not disabled because she could work as a furniture rental consultant or a full-time usher, jobs which under the Department of Labor Dictionary of Occupational Titles, the gold standard relied upon in disability cases, required English language fluency. At Grullon's disability hearing, a Vocational Expert testified that she could perform these jobs after being admonished by the ALJ to ignore her language barriers to employment.

On appeal, the Commissioner defends this counter-intuitive conclusion by arguing that Social Security regulations now clearly state that a lack of English language fluency cannot be considered a disability when evaluating Social Security claims. While this is true, the Commissioner's argument ignores the fact that there is also a macro-economic component to disability analysis which considers whether there are a significant number of jobs in the national economy which a disability claimant can perform. This macro-economic analysis, in turn, is guided by a Department of Labor publication, the Dictionary of Occupational Titles, which explicitly considers English fluency when assessing an individual's ability to perform job duties.

Thus, when viewed through a pragmatic lens, the ALJ's decision in this case reaches an indefensible outcome—a determination that Grullon can perform jobs

that require fluency in a language she can neither speak nor understand. Moreover, this conclusion rests upon an unresolved discrepancy between the Vocational Expert's testimony, which discounted language barriers at the ALJ's direction, and the job requirements set forth in the Dictionary of Occupational Titles, which requires some consideration of English fluency. In our view, the ALJ's failure to address these inconsistencies results in a decision which cannot be sustained when viewed pragmatically in light of economic realities. Accordingly, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.    **Statement of Facts and of the Case**

### A. **Factual Background**

On July 27, 2021, Ana Grullon filed applications for a period of disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act, alleging a period of disability beginning January 1, 2021. (Tr. 22). In these applications, Grullon alleged that she was disabled due to the combined effects of the following physical and emotional impairments: cervical and lumbar degenerative disc disease, calcific tendinitis of shoulders, and myofascial pain syndrome. (Tr. 25).

Grullon was born in the Dominican Republic in February of 1973 and was 47 years old at the time of the alleged onset of her disability. (Tr. 35). She had a

rudimentary tenth grade education in her homeland, but at the time of her disability application could not read, write, or speak English. In fact, Grullon reported that she was barely literate in her native tongue, Spanish, and could only understand simple written instructions in Spanish. (Tr. 288, 290). Given her complete lack of English proficiency, Grullon's prior employment history was marked by factory and warehouse jobs which did not require her to communicate in English with the public. (Tr. 290).

The administrative record is replete with references to Grullon's inability to communicate in any meaningful way in English. Thus, Grullon required a Spanish interpreter in connection with her disability proceedings. (Tr. 22, 45-53, 116, 139, 288, 349). Further, with one exception, she also needed the assistance of a Spanish interpreter at her medical appointments. (Tr. 386, 393, 573, 595, 597, 602, 607, 612, 637).[2]

It was against this backdrop, a backdrop which revealed Grullon's inability to communicate in a meaningful fashion in English, that Grullon's disability claim came to be heard by the ALJ.

---

[2] On one occasion it was reported that Grullon could speak English. (Tr. 608). In every other instance, she required the assistance of an interpreter at her medical appointments.

B. **The ALJ Hearing and Decision.**

On November 1, 2022, the ALJ conducted a hearing in Grullon's case. (Tr. 41-68). At this hearing, Grullon testified in Spanish, aided by an interpreter, describing her impairments. (Tr. 41-53). Following Grullon's testimony, Dr. William Reed, a vocational expert, testified. (Tr. 53-68). Recognizing Grullon's lack of English proficiency, at the outset of his expert testimony Dr. Reed sought clarification from the ALJ regarding whether he should consider Grullon's apparent language barriers when assessing her employment prospects, and he was instructed to ignore this fact in his analysis. In the course of the hearing the ALJ and vocational exert engaged in the following exchange:

> VE: Am I to take into account the Claimant's express need for an interpreter for her to understand? In other words, would the language also be an issue?
>
> ALJ: We are not any longer to consider that. That has never been part of the residual functional capacity, no. And even with our grid rules now, that is not to be considered.

(Tr. 56).

Admonished to ignore these obvious language barriers, the  vocational expert then opined that, given the impairments posited by the ALJ, Grullon could perform two jobs described in the Dictionary of Occupational Titles, furniture rental consultant and usher. (Id.)

5

These were odd and anomalous findings for a person like Grullon who cannot read, write, or speak English given the express requirements of these two job titles, as defined in the Dictionary of Occupational Titles. For example, the job description for a furniture rental consultant called for a:

> Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

295.357-018 Furniture-rental Consultant, DICOT 295.357-018.

The job description for this position further emphasized the need for fluency in the primary language of customers, English, explaining that the duties of this position included the following:

> Rents furniture and accessories to customers: Talks to customer to determine furniture preferences and requirements. Guides or accompanies customer through showroom, answers questions, and advises customer on compatibility of various styles and colors of furniture items. Compiles list of customer-selected items. Computes rental fee, explains rental terms, and presents list to customer for approval. Prepares order form and lease agreement, explains terms of lease to customer, and obtains customer signature. Obtains credit information from customer. Forwards forms to credit office for verification of customer credit status and approval of order. Collects initial payment from customer. Contacts customers to encourage followup transactions. May visit commercial customer site to solicit rental contracts, or review floor plans of new construction and suggest suitable furnishings. May sell furniture or accessories.

Id.

Likewise, conversational fluency in the primary language of patrons seemed to be an essential prerequisite to the job of an usher since these job duties included: "Assist[ing] patrons at entertainment events to find seats, search for lost articles, and locate facilities, such as restrooms and telephones." 344.677-014 Usher, DICOT 344.677-014. In order to perform these tasks, the Dictionary of Occupational Titles indicated that a worker would need to be able to: "Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers." Id.

Having been ordered by the ALJ to ignore any language barriers to employment, the vocational expert never reconciled his opinion that Grullon, who possessed no English fluency, could perform these duties which clearly seemed to call upon her to extensively communicate in English, and possess an English vocabulary of thousands of words.

In the ALJ's November 14, 2022 decision denying Grullon's disability claim, the ALJ embraced this anomaly and misstated the vocational expert's opinion as it related to this issue. (Tr. 16-36). In that decision, the ALJ first concluded that Grullon met the insured requirements of the Act through June 2026, and had not engaged in substantial gainful activity since January 2021, the alleged onset date.

7

(Tr. 24-25). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Grullon had the following severe impairments: cervical and lumbar degenerative disc disease, calcific tendinitis of shoulders, and myofascial pain syndrome. (Tr. 25). At Step 3, the ALJ determined that Grullon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 26-28).

Having made these findings, between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff and determined that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is capable of occasional balancing, stooping, crouching, crawling, kneeling, and climbing of ramps and stairs, but never climbing on ladders, ropes, or scaffolds. The claimant is capable of frequent overhead reaching with her upper extremities, frequent push/pull activities with her upper extremities, including hand levers, occasional fine and gross manipulation bilaterally, and occasional fingering. The claimant is limited to frequent exposure to temperature extremes of cold and heat, vibrations, and hazards, including moving machinery and unprotected heights.

(Tr. 28).

The ALJ then concluded at Step 4 of this sequential analysis that Grullon could not perform her past work, (Tr. 35), but found at Step 5 that there were other jobs that existed in significant numbers in the national economy which Grullon could

perform. (Tr. 35-36). In reaching this conclusion the ALJ expressly adopted the vocational expert's curious conclusion that Grullon could perform jobs which required her to have significant English fluency despite the fact that she apparently could not speak English, stating that:

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
> • Furniture rental consultant, DOT # 295.357-018, light and unskilled, SVP 2, approximately 60,000 positions in the national economy; and
>
> • Usher, DOT # 344.677-014, light and unskilled, SVP 2, approximately 5,000 positions in the national economy.

(Tr. 35-36).

However, even as the ALJ embraced the vocational expert's testimony, she significantly misstated this testimony. The ALJ's decision stated that the vocational expert "opined that language does not affects [sic] the jobs provided." (Tr. 36). This is not a fair or accurate summary of the vocational expert's testimony. Far from testifying that language barriers were irrelevant to this analysis, the expert asked whether he could consider Grullon's lack of English fluency and was forbidden from doing so by the ALJ. (Tr. 56). Thus, the ALJ's decision converted her ruling forbidding consideration of language issues by the expert into an expert opinion that language fluency was immaterial to employment in fields which required

communication with customers and patrons. Having concluded that Grullon, who could speak virtually no English, could perform jobs that require fluency in a language she can neither speak nor understand, the ALJ denied her disability claim. (Tr. 36).

This appeal followed. (Doc. 1). On appeal, Grullon argues, *inter alia*, that the ALJ's complete failure to address the disparity between the Dictionary of Occupational Titles' language requirements and the vocational expert's testimony which discounted these language fluency requirements at the ALJ's direction now mandates a remand. As discussed below, we agree and will remand this case for further consideration by the Commissioner.

## III.    <u>Discussion</u>

### A. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous

work or any other substantial gainful activity that exists in the national economy.  42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of

the Social Security Act, a claimant must show that he or she contributed to the

insurance program, is under retirement age, and became disabled prior to the date on

which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a

five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether the claimant has a severe impairment; (3)

whether the claimant's impairment meets or equals a listed impairment; (4) whether

the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience

and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual

functional capacity (RFC).  RFC is defined as "that which an individual is still able

to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R.

§§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of

the claimant's medically determinable impairments, including any non-severe

11

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## B. **The Role of the Vocational Expert and Dictionary of Occupational Titles in Disability Analysis.**

Oftentimes, as in this case, an ALJ turns to the testimony of a vocational expert based upon data drawn from the Dictionary of Occupational Titles to carry the Commissioner's burden at Step 5 to show that jobs exist in significant number in the national economy that the claimant can perform consistent her age, education, work experience and RFC. In this setting:

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy.

Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005). When opining on this question, the vocational expert, in turn, "will generally consult the Dictionary of Occupational Titles (DOT), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

13

The evidentiary value of this vocational expert testimony and reliance upon the Dictionary of Occupational Titles to carry the Commissioner's Step 5 burden of proof is directly a function of how accurately that testimony reflects economic reality.  Recognizing this fact, the Dictionary of Occupational Titles catalogues a compendium of job titles, describing the responsibilities of myriad tasks, and assessing the physical, exertional, learning and language requirements for each of these jobs. Thus, the Dictionary of Occupational Titles expressly acknowledges that language development skills are an essential attribute of employment. Appendix C - Components of the Definition Trailer, 1991 WL 688702. The Dictionary then prescribes a six-tier system for assessing the level of language skill needed for various tasks. Id. However, even the lowest two of these language development skill levels impose significant fluency standards and require passive vocabularies of 2,500 to 6,000 words, reading rates of 95-200 words per minute, the ability to write simple or compound sentences, and the ability to speak clearly and concisely. Id.

On this score, we agree that the better view of these language development skill ratings, particularly when considering job titles that involve communication with the public, is that the Dictionary's language development levels measure fluency in the nation's primary language, English. Pinto v. Massanari, 249 F.3d 840, 844 n.2 (9th Cir. 2001) (suggesting that "the most persuasive reading" of the

14

Dictionary of Occupational Titles is that "the applicant must be able to perform these functions in English"). This interpretation of the language development requirements of the Dictionary of Occupational Titles, which ties work language fluency to the nation's predominant language, is entirely consistent with the goal of Step 5 analysis which is to show that jobs exist in significant number in the national economy that a claimant could perform. Moreover, an interpretation of these language fluency criteria which suggests that these work-related requirements could be satisfied by fluency in *any* language would potentially lead to absurd results. For example, such an interpretation would conceivably mean that an individual could meet the language development skills needed to be a college lecturer in this country based upon a fluency in some language which no one in the United States understood. Therefore, when viewed through a pragmatic lens, the Dictionary of Occupational Titles' language skills levels must be construed to refer to fluency in the primary language spoken in the relevant community, English.

Given the purpose served by the Dictionary's language skills development criteria, when an ALJ fails to reconcile an inconsistency between the plaintiff's English language illiteracy and the language development levels of the jobs suggested by the vocational expert based upon the Dictionary of Occupational Titles Third Circuit case law often requires a remand. See Marisol M. v. Comm'r of Soc.

15

Sec., No. 1:20-CV-08993-NLH, 2022 WL 2357413, at *6 (D.N.J. June 29, 2022).

See Rosas v. Colvin, No. SACV 13-1958 SS, 2015 WL 350354, at *5 (C.D. Cal. Jan. 26, 2015).[3] Simply put, it is well-settled that an ALJ may not allow inconsistencies between a claimant's actual skills, a vocational expert's testimony, and the criteria set forth in the Dictionary of Occupational Titles to go unaddressed and unresolved. Thus, the Third Circuit has long held that:

> To ensure consistency, courts have imposed an obligation on ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs ... and information in the [DOT]." Id. at *1; Rutherford, 399 F.3d at 556. Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) "elicit a reasonable explanation" where an inconsistency does appear, and (3) explain in its decision "how the conflict was resolved." Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir.2002). An ALJ's failure to comply with these requirements may warrant remand in a particular case. Rutherford, 399 F.3d at 557.

Zirnsak v. Colvin, 777 F.3d 607, 617 (3d Cir. 2014).

---

[3] We acknowledge that these cases pre-date the Commissioner's amendment of the regulations discussing the relevance of English fluency, however, as discussed below we do not construe these regulations to amend or repeal the Dictionary of Occupational Titles in a way which would lead to unexplained, irrational inconsistences. Therefore, we regard these cases as still correctly describing the rules as they apply to interpreting the Dictionary of Occupational Titles.

### C. **Substantial Evidence Review – the Role of this Court.**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and

> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to ALJ decisions, like the ruling in this case, which rest upon unresolved inconsistencies between a vocational expert's testimony and the skill requirements prescribed by the Dictionary of Occupational Titles. When such inconsistencies exist, it is incumbent upon the ALJ to: (1) identify the inconsistency; (2) address the inconsistency with the vocational expert; and (3) resolve the inconsistency in the ALJ's decision. The failure to do so often compels a remand. Zirnsak, 777 F.3d at 617.

**D.**    **This Case Will Be Remanded for Further Consideration of the Inconsistency Between the Vocational Expert Opinion and the Dictionary of Occupational Titles.**

As we have noted, the ALJ's decision in this case rests upon a pillar of sand which is unmoored to economic reality. Having forbidden the vocational expert from considering language barriers to employment when construing the Dictionary of Occupational Titles, the ALJ then embraced the expert's conclusion that Grullon—who cannot read, write, or speak English to any appreciable degree—could nonetheless work in customer service fields that require frequent fluent communication with an English-speaking population.

How has the Commissioner reached this curious conclusion? For the Commissioner, the answer to this question is simple. The Commissioner notes that, in 2020, the agency revised its regulations to eliminate relevance of English language skills from the education component of its Step 5 analysis. Removing Inability to Communicate in English as an Education Category, 85 FR 10586-01, 10587, 10596. 2020 WL 885690 (February 25, 2020). Citing this regulatory change, the Commissioner argues that English language fluency is now essentially irrelevant to the disability determination, a view that some courts have reflexively adopted.[4]

_____

[4] Sofia T. v. Comm'r of Soc. Sec., No. 22-5497, 2023 WL 2424072, at *2 (W.D. Wash. Mar. 9, 2023); Golshan D. v. Kijakazi, No. 21- 00450, 2023 WL 1823520,

While we agree that this regulatory change significantly alters the analysis of English literacy under the agency's rules, we do not believe that these revised regulations, standing alone, wholly foreclose consideration of language barriers to employment. In this regard, our position stems from the recognition that disability determinations are complex multi-facetted medical and macro-economic decisions that are often governed by benchmarks defined by two different federal agencies—the Social Security Administration and the Department of Labor. While these revised Social Security regulations govern many aspects of disability analysis, we do not construe these regulations as silently repealing or amending the Department of Labor's Dictionary of Occupational Titles to make English fluency immaterial. Further, in our view, the Dictionary of Occupational Titles' language development skill requirements must be read in a fashion which is firmly rooted in economic realities. This means that, under the Dictionary of Occupational Titles, English language fluency remains a relevant factor in determining the actual ability of a claimant to do certain types of work. Indeed, the failure to construe the Dictionary of Occupational Titles in this manner wholly undermines the evidentiary value of

---

at *5 (D. Utah Jan. 23, 2023); Gina C. v. Comm'r of Soc. Sec. Admin., No. 21-00423, 2022 WL 167922, at *11 (D. Conn. Jan. 18, 2022).

this yardstick in answering the fundamental question of whether jobs actually exist in significant numbers in the national economy which the plaintiff can perform.

With this understanding of the role which the Dictionary of Occupational Titles' language development standards play in disability analysis, we find that the ALJ's decision in this case is flawed in at least two ways.

First, the decision materially misstates the vocational expert testimony in this case. The ALJ's decision stated that the vocational expert "opined that language does not affects [sic] the jobs provided." (Tr. 36). This is not correct. Far from testifying that language barriers were irrelevant to this analysis, the expert asked whether he could consider Grullon's lack of English fluency and was forbidden from doing so by the ALJ. (Tr. 56).

More fundamentally, after masking any discrepancy between the expert's position and the Dictionary of Occupational Titles' language development standards, the ALJ's decision failed to (1) identify the inconsistency; (2) address the inconsistency with the vocational expert; and (3) resolve the inconsistency in the ALJ's decision, as the ALJ was required to do under governing Third Circuit standards. This failure of analysis, in turn, prejudiced the consideration of Grullon's

disability claim since the ALJ found that Grullon could work in fields that required

English language skills which she does not appear to possess.[5]

_____

[5] There is a second flaw in this Step 5 analysis. According to the evidence, with respect to one job identified by the ALJ that Grullon could perform, usher, there are only 5,000 positions available in the national economy. This meager number of positions, standing alone, simply is insufficient to carry the Commissioner's Step 5 burden of showing that a significant number of jobs exist in the national economy since:

> [T]he Third Circuit has also provided us with benchmarks regarding what constitutes a substantial number of jobs in the national economy, finding that, "the testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers." Young v. Astrue, 519 F. App'x 769, 772 (3d Cir. 2013). Conversely, when the number of jobs identified in the national economy totals less than 10,000 positions, or the number of regional jobs falls below 100, courts have frequently found that the Commissioner's burden of proving at Step 5 that jobs existed in significant numbers in the national economy has not been met. See e.g., Beltran v. Astrue, 700 F.3d 386, 389 (9th Cir. 2012) (135 jobs in the regional economy held not significant); Ellis v. Kijakazi, 553 F. Supp. 3d 628, 635 (E.D. Wis. 2021) (remanding where only 14,500 jobs identified in the national economy); Ochoa v. Colvin, No. 1:12-CV-00604-SKO, 2013 WL 4816130, at *8 (E.D.Cal. Sept. 6, 2013) (80 jobs in Sacramento were not significant); Valencia v. Astrue, No. C 11-06223 LB, 2013 U.S. Dist. LEXIS 41758, 2013 WL 1209353, at *18 (N.D.Cal. Mar. 25, 2013) (114 regional jobs in San Francisco Bay area and 14,082 national jobs were not significant); Lenon v. Apfel, 191 F. Supp. 2d 968, 979 (W.D. Tenn. 2001) (117 jobs in the regional economy held not significant); Jimenez v. Shalala, 879 F. Supp. 1069, 1076 (D. Colo. 1995) (200–250 jobs in regional economy held not significant).

Simply put, the ALJ's Step 5 decision, which finds that Grullon can work in jobs that the Dictionary of Occupational Titles indicates she lacks the language skills to perform, is flawed in ways which compel a remand of this case. Because we have found a basis for remand on these grounds, we need not address Grullon's remaining arguments. To the extent that any other error occurred, it may be remedied on remand.

In closing we emphasize that our holding is narrow, but necessary, given the ALJ's conclusion that Grullon can perform jobs that under the Dictionary of Occupational Titles require a level of language which the record indicates she simply does not possess. Yet, while we reach this conclusion, we note that nothing in this opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

An appropriate order follows.

_S/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED:    October 31, 2024

---

Bidwell v. Kijakazi, No. 1:21-CV-1387, 2023 WL 7221347, at *8 (M.D. Pa. Nov. 2, 2023).